UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-81747-CIV-MATTHEWMAN

KEITH R. SLAYMAKER,

      Plaintiff,

v.



NANCY A. BERRYHILL[1],
Acting Commissioner of Social Security
Administration,

      Defendant.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 37, 38]

**THIS CAUSE** is before the Court upon Plaintiff, Keith R. Slaymaker's ("Plaintiff"),

Motion for Summary Judgment with Supporting Memorandum of Law [DE 37], and Defendant,

Nancy A. Berryhill, Acting Commissioner of Social Security Administration's ("Defendant")

Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to

Plaintiff's Motion for Summary Judgment [DE 38]. Plaintiff filed a Reply [DE 40] to

Defendant's Response. The parties have consented to magistrate judge jurisdiction. *See* DE

20. The issues before the Court are whether the record contains substantial evidence to support

the denial of benefits to Plaintiff and whether the correct legal standards have been applied.

*Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill, the new acting commissioner of Social Security, will be substituted as a party in this case. Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

# I.  FACTS

On July 23, 2013, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, asserting a disability on-set date of June 1, 2013.  [R. 30].[2]  The application was denied initially and upon reconsideration.  *Id.*  Following a video hearing on January 7, 2015, Administrative Law Judge Mattie Harvin-Woode (the "ALJ") issued a decision on March 31, 2015, denying Plaintiff's request for benefits.  [R. 27-45].  A request for review was filed with the Appeals Council and denied on November 20, 2015.  [R. 1-7].  Plaintiff's date last insured is December 31, 2018.  [R. 30].

## A.  Hearing Testimony

The ALJ held a video hearing on January 7, 2015.  [R. 46].  Plaintiff stated that his date of birth was October 26, 1974, making him forty years old at the time of the hearing.  [R. 51.  According to Plaintiff, he obtained a doctorate degree in chiropractic medicine.  *Id.*

Plaintiff testified that he worked at a restaurant in June of 1997 while he was in school.  [R. 52].  He explained that, in June of 1997, he was experiencing weakness on his left side, in his left arm, and had severe headaches.  *Id.*  According to Plaintiff, he is right-handed.  *Id.*

Plaintiff testified that he worked as a customer service representative from October 2002 through March of 2003.  [R. 66-67].  Plaintiff stated that he then worked as a chiropractor for over ten years.  [R. 52].

Plaintiff then testified as to his medical problems.  [R. 53].  He stated that he has chronic fatigue and was diagnosed with idiopathic hypersomnia.  *Id.*  Plaintiff testified that he wakes up at 8:00 or 9:00 in the morning and has difficulty getting up in the morning because he is tired.  [DE 54].  He said that he takes stimulants and is prescribed Amphetamine and

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 17.

Dextroamphetamine to keep him awake during the day. *Id.* According to Plaintiff, when he was working he had to take three naps a day. *Id.*

In addition to the chronic fatigue, Plaintiff testified that he has pain throughout his back. *Id.* He stated that he gets his back adjusted frequently and gets massages in order to alleviate his back pain. [R. 54-55]. According to Plaintiff, his back pain prevents him from lifting as much as he could if he did not have the back pain and sometimes, when it is more severe, he cannot lift anything and cannot bend over. [R. 55]. Plaintiff testified that he is prescribed Hydrocodone for his back pain. *Id.* According to Plaintiff, the Hydrocodone that he takes will sometimes make him even more tired and contribute to his chronic fatigue. *Id.*

Plaintiff testified that he also has anxiety and depression, and is prescribed the generic version of Cymbalta. *Id.*

Then, Plaintiff testified about his carpal tunnel surgery. [R. 56]. Plaintiff stated that his carpal tunnel syndrome is "a lot better now." *Id.* Before the surgery, Plaintiff testified that he had numbness in his fingers, which has since resolved, but he said that he is not as strong as he once was. *Id.* According to Plaintiff, if he does anything repetitive, especially with his left arm, "it bothers [him] a lot." *Id.* Plaintiff stated that he also has a "tic," which causes him to want to grab at his left armpit with his thumb. *Id.* He stated that he has developed tendonitis and early onset arthritis in his wrist. *Id.* Plaintiff alleged that he had to quit working because he could no longer press with his thenar eminence or hold a person's head with his left arm. [R. 56-57].

Plaintiff also stated that he was diagnosed with dystonia in his left upper extremity because of the strokes he has had. [R. 57]. According to Plaintiff he has "innumerable hemangiomas" in his brain, many of which have bled. *Id.* Plaintiff testified that the dystonia

causes his hand to "curl up and turn in." [R. 58].

In addition to the medications he listed previously, Plaintiff stated that he also takes Duloxetine and Meloxicam for his pain and stiffness. *Id.*

Plaintiff testified that he also has sleep apnea. [R. 60]. Plaintiff stated that he cannot remember the last time that he felt good or woke up feeling refreshed. *Id.*

According to Plaintiff, he cannot perform any sort of work because he has to have periodic naps and "down time" throughout the day and cannot sit for long periods of time because he will fall asleep. [R. 61].

Plaintiff stated that he lived in Iowa before moving to Florida in June of 2013. [R. 62]. He testified that his wife moved to Florida while he and their three children remained in Iowa for a few more months. *Id.* Plaintiff said that he would take the kids to school in the morning every day during this time and would pick them up from day care about once a week. [R. 62-63].

According to Plaintiff, he occasionally brings his children to the bus stop now that they live in Florida, but his wife does it most days. [R. 64]. Plaintiff testified that he does limited household chores and tries to help with meal preparation, such as opening cans and microwaving meals. *Id.*

Next, Steve Bass, a vocational expert, testified. [R. 67]. He classified Plaintiff's past work as a chiropractor as highly skilled with an SVP level of 8 in the medium exertional work category, and Plaintiff's past work as a customer service representative as skilled with an SVP level of 5 in the sedentary exertional category. [R. 67]. The ALJ posed the vocational expert a hypothetical in which an individual could work at the light exertional level and may have additional limitations, and the individual could occasionally balance, stoop, kneel, crouch, crawl,

4

and climb ramps and stairs, never climb ladders, ropes, or scaffolds, can frequently handle with both hands, and should avoid concentrated exposure to hazards. [R. 68]. The ALJ also stated that the individual in the hypothetical could perform simple tasks and some detailed tasks, up to semi-skilled work. *Id.* Given those facts, the vocational expert found that the individual could not perform past relevant work as performed or as generally performed in the national economy. *Id.* However, the vocational expert stated that the individual could perform other jobs, such as a storage facility rental clerk, a furniture rental clerk, or a parking lot attendant. *Id.*

Next, the ALJ posed a hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual had to sit every forty-five minutes for one to two minutes, but could continue working while seated. [R. 69]. The vocational expert stated that if the individual were so limited, then they could still perform the positions of a storage facility rental clerk and a furniture rental clerk with virtually zero erosion, and could still perform the position of parking lot attendant with about two percent erosion. *Id.*

Then, the ALJ posed a third hypothetical in which an individual could do everything listed in the first hypothetical, except they were limited to sedentary work instead of light work. *Id.* The vocational expert testified that a person so limited could perform a semi-skilled occupation of dispatcher for maintenance service or unskilled occupations of order clerk for food and beverage or an addresser who labels, inserts, and collates correspondence. [R. 69-70].

### B. Medical Record Evidence

In reaching her decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

Plaintiff presented to Dr. Robert Hodge beginning in July of 1997, at twenty-two years of age, after being discharged from the hospital "with multiple intracranial hemorrhages, left

5

hemiparesis and neglect, VP shunt, history of multiple hemorrhages inside various large muscle groups." [R. 344]. While in the hospital, Plaintiff received a ventriculoparietal shunt. [R. 346]. Plaintiff was diagnosed with Rendu-Osler-Weber and left hemiparesis. [R. 344]. At this time, Plaintiff had pain along his right lower chest and up into his right shoulder blade. *Id.* Dr. Hodge assessed that Plaintiff probably had an intercostal muscle spasm due to either strain or the way Plaintiff was moving. *Id.* The doctor prescribed Percocet as a backup to using heat, massage, Tylenol, and Advil to treat his pain. *Id.*

Plaintiff's shunt was removed towards the end of 1997, and his atypical pains improved. [R. 338]. However, in July of 1998, Plaintiff developed increased left-sided weakness and increasing headaches. *Id.* A scan showed that Plaintiff had two new hemorrhages in the left hemisphere, subcortical. *Id.* Plaintiff was also diagnosed with partial simple seizures, which were partially controlled with medication, Tegretol. [R. 339]. Plaintiff complained that his left hand was slow and hard to control, but other than that he was close to feeling back to normal. [R. 336]. Plaintiff continued to undergo CT scans, which came back negative besides the previously identified cavernous hemangiomas. [R. 500-03].

In 2006, Plaintiff was having pain and stiffness in his left side, including his elbow and thumb. [R. 328]. Plaintiff was told he had mild carpal tunnel syndrome in his left hand and was given a splint to wear, but tests for carpal tunnel syndrome were negative. [R. 329]. Dr. Hodge injected Plaintiff with a steroid to relieve his elbow stress. [R. 328].

Plaintiff started reporting problems with fatigue in 2008, and saw Dr. Andrew Peterson. [R. 357]. Plaintiff was diagnosed with obstructive sleep apnea and Dr. Peterson conducted some polygraph sleep recordings after Plaintiff's wife stated that, during sleep, Plaintiff was snoring, gasping for air, and talking in his sleep. *Id.* As a result of the recordings, Dr.

Peterson recommended that Plaintiff use a Continuous Positive Airway Pressure ("CPAP") of 15 because it eliminated Plaintiff's apnea and provided stable REM in all positions for Plaintiff. [R. 356]. Dr. Peterson also recommended that Plaintiff try to lose weight and avoid respiratory depressants. *Id.*

In April of 2009, Plaintiff reported increasing problems with fatigue to Dr. Steven Eyanson and was placed on a CPAP again. [R. 318]. The CPAP helped alleviate Plaintiff's sleeping problems. [R. 439]. Dr. Eyanson also noted Plaintiff's memory lapses or loss, anxiety, depression, and "inability to cope with daily activities." [R. 319]. Also at this time, Dr. Hodge recommended that Plaintiff start a regular diet and exercise program. [R. 434].

Then, in February of 2010, Plaintiff presented to University of Iowa Hospitals & Clinics with complaints of increasing fatigue, diffuse joint pain, diffuse stiffness, and diffuse muscle ache. [R. 308]. Plaintiff reported that his worst areas were his back, hands, and elbows. *Id.* Plaintiff noted that he gave up golf because of his wrist and elbow pain. *Id.* After following his doctor's advice to exercise, Plaintiff lost twenty pounds and had less pain, stiffness, and fatigue when he was walking five days a week. *Id.* However, in August of 2010, Plaintiff requested and received a steroid injection in his right elbow for his pain. [R. 1125].

In February of 2012, Plaintiff reported frustration with his fatigue and "generally not feeling well" over the past several months. [R. 601]. In April of 2012, Plaintiff went to the Emergency Department of Mercy Medical Center. [R. 555]. Plaintiff reported that he had a terrible headache and had a history of chronic headaches. [R. 556]. Plaintiff also reported that he was having different issues recently with joint pain and low blood sugar. *Id.* Plaintiff stated that he took hydrocodone for the pain. *Id.* Plaintiff had an MRI of his head done, which showed "multiple areas of old hemorrhage...[but n]o evidence of acute infarct on

diffusion imaging." [R. 690].

In April of 2012, Plaintiff presented to Dr. Hodge again with complaints of increased fatigue and pain. [R. 925-952]. Dr. Hodge noted that the many modalities Plaintiff had tried did not work to alleviate his pain, including anti-inflammatories, medicine, antidepressants, etc. [R. 952]. Plaintiff continued to see Dr. Hodge with the same complaints and stated that he "can nap at about any time and just doesn't feel well." [R. 949]. Dr. Hodge noted that if Plaintiff "would shed 100 lbs. or more that would be very, very beneficial to his overall health and status." *Id.*

In July of 2012, Plaintiff had lost approximately twenty-five pounds, stated that he was feeling better overall, but still had some fatigue and low energy. [R. 946]. However, in August of 2012, Plaintiff was again feeling fatigued and having pain, and informed Dr. Hodge that he had to "lay down and rest an hour or two during the day and it is really interfering with his work to the point that he wonders if he will be able to continue to work." [R. 943].

Plaintiff had an X-ray of his lumbar spine performed on September 3, 2012, to assess his left, lower lumbar pain, which showed mild degenerative changes with disk space narrowing at L4-L5. [R. 469].

Plaintiff began seeing Dr. Peterson again in September of 2012 for his sleep issues. [R. 775]. Dr. Peterson noted that Plaintiff was snoring, had dry mouth upon awakening, woke up gasping for air, and had restless legs at night. [R. 776]. Plaintiff reported that Lyrica helped him some, Meloxicam helped his arms some, and Zolpidem helped him sleep. *Id.* Dr. Peterson stated that Plaintiff was having some somnolence during the day. *Id.* In counseling Plaintiff, Dr. Peterson stated that "patients with [obstructive sleep apnea who] are adequately treated may still be sleepy." [R. 780].

In October of 2012, Dr. Kevin Carpenter performed surgery on Plaintiff to remedy his obstructive sleep apnea, tonsillar hypertrophy, and inferior turbinate hypertrophy. [R. 354]. A post-operative examination by Dr. Carpenter went well and the doctor suggested Plaintiff schedule a follow-up sleep study after he reached his weight loss goal. [R. 896]. On November 28, 2012, Plaintiff presented to Dr. Carpenter for a post-operative check-up complaining of a sinus infection, fatigue, sore muscles, poor concentration, and a constant feeling of being cold. [R. 752]. Plaintiff reported that he was working on his weight loss, was no longer snoring, and was ready to move south. *Id.*

On October 23, 2012, Plaintiff first presented to Dr. Timothy Loth for sharp and throbbing pain in his left thumb. [R. 759]. Plaintiff complained that his whole left hand felt weak and was hard to move. *Id.* Dr. Loth opined that Plaintiff may have left TMC synovitis and early arthritis. *Id.* The doctor gave Plaintiff a cortisone shot, which provided temporary relief. *Id.* Plaintiff presented to Dr. Loth again on November 12, 2012, and received another injection for pain in his left thumb. [R. 756].

On December 19, 2012, Plaintiff presented to the Mayo Clinic for evaluation of prior cerebral hemorrhage. [R. 860]. Plaintiff's diagnoses were multiple intracerebral cavernous hemangiomas, generalized myofascial pain syndrome, and a focal seizure disorder, quiescent. [R. 861]. However, the physician opined that Plaintiff did not have a history consistent with hereditary hemorrhagic telangiectasia because there was no evidence of cutaneous or visceral involvement. *Id.*

In January of 2013, Dr. Hodge told Plaintiff that he had "really exhausted [his] area of expertise with his health issues and [was] probably best served by the specialists [they] connected him with." [R. 932].

9

On January 8, 2013, Plaintiff underwent a diagnostic polysomnogram with Dr. Peterson for evaluation of his obstructive sleep apnea. [R. 350]. The recording showed that Plaintiff's sleep apnea was positional and that it was present when he was in a supine position, but the sleep apnea had improved compared to Plaintiff's prior study. *Id.* On January 15, 2013, Dr. Peterson noted that Plaintiff felt "like a wreck," he had pain in his left arm making his bicep tighten and his left elbow hurt, grabbing anything bothered him, he had some lower back pain, and was in a bad mood in general, including irritability, crying, and anger. [R. 735-36]. Dr. Peterson stated that Plaintiff said his chronic pain was his "big issue." [R. 736]. Dr. Peterson found that Plaintiff's sleep apnea was much-improved post-op and now he only had positional apnea. [R. 739]. Dr. Peterson opined, "[c]learly I think you [Plaintiff] are disabled from working as a chiropractor and I would encourage you to try to sell the business and go on disability." *Id.*

On January 15, 2013, Plaintiff presented to Dr. Loth again with complaints of his left thumb bothering him after the effects of the first injection wore off. [R. 746]. Plaintiff reported that he was in a lot of pain and used a splint all the time. *Id.* Plaintiff stressed his left upper extremity pain, including in his thumb, radial forearm, and bicep area anteriorly. *Id.* Dr. Loth stated that Plaintiff had "developed a tic in the left upper extremity wherein he will hook his thumb around his armpit as if clearing the armpit, and that will exacerbate his pain." *Id.* Dr. Loth opined that Plaintiff's "trapeziometacarpal arthritis precludes [Plaintiff's] functioning as a chiropractor." *Id.*

On February 8, 2013, Dr. Hodge and Dr. Loth referred Plaintiff to Dr. Michael Brooks for evaluation of Plaintiff's chronic pain syndrome. [R. 714-20]. Plaintiff complained of fatigue, weakness, mostly in his left upper extremity, neck pain, memory loss, anxiety,

depression, and sleep disturbances. [R. 714-17]. Plaintiff appeared well-developed, well-nourished, and in no acute distress, but Dr. Brooks noted that Plaintiff was overweight. [R. 717]. The doctor concluded that a "good portion" of Plaintiff's symptoms (with his left arm spasm) were "probably more related to his central nervous system lesions with a degree of spastic disease and possibly seizure activity." [R. 719]. Dr. Brooks opined that these symptoms, combined with Plaintiff's sleep apnea, depression, memory loss, mental function, and inability to tolerate cold, make it "extremely difficult for [Plaintiff] to function in any type of gainful employment." *Id.* Therefore, Dr. Brooks recommended that Plaintiff sell his practice as a chiropractor and "move south for symptom control" because a warmer climate and less stress would be beneficial to Plaintiff. *Id.* The doctor also recommended that Plaintiff start some form of "low impact exercise such as walking or cycling on a daily basis." *Id.*

In February of 2013, Plaintiff presented to Dr. Ellie Snavely, a licensed psychologist, for a neuropsychological evaluation. [R. 1047-53]. Dr. Snavely used Plaintiff's prior neuropsychological evaluation from 1997 for comparison. [R. 1047]. Plaintiff reported problems with memory, difficulty learning new tasks and procedures, being easily distracted, losing his train of thought, and being forgetful. [R. 1048]. After testing, Dr. Snavely concluded that Plaintiff had acquired cognitive deficits primarily in speed of processing and sustained concentration, which are seen "in association with a wide variety of neurological, general medical, and psychiatric disorders." [R. 1052]. There was "no evidence whatsoever of a pattern of regular cognitive decline such as would be seen in association with any of the neuro-degenerative disorders." *Id.* Dr. Snavely opined that "the visual spatial perceptual deficits for both reasoning, judgment, and short-term that were present in 1997, one month after the hemorrhagic events, ha[d] completely resolved." [R. 1052-53]. However, Dr. Snavely

noted that Plaintiff experienced moderate depression and moderate to moderately severe anxiety, which did not appear present at the time of the 1997 evaluation. [R. 1053].

Plaintiff presented to Dr. Peterson again in April of 2013 with complaints of worsening fatigue and pain and soreness in his left arm. [R. 843]. Dr. Peterson stated that Plaintiff's pain and soreness was triggering his fatigue. *Id.* Plaintiff reported that he sold his practice and his house, that his wife started a job in Florida, and that he and the kids would be joining his wife in Florida soon. *Id.* Dr. Peterson noted that Plaintiff experienced drowsiness while driving and while sitting or reading. [R. 845]. Dr. Peterson also noted that Plaintiff still had anxiety but no depression or sleep disturbances. *Id.* However, the doctor also stated that Plaintiff needed to "get the anxiety and depression under control and reassess." [R. 846]. Dr. Peterson opined that Plaintiff was "clearly disabled from [his] work as a chiropractor." [R. 847]. The doctor also noted that the Mayo Clinic was convinced that Plaintiff did not have Rendu-Osler-Weber. [R. 846].

Plaintiff also presented to Dr. Hodge again in April of 2013 complaining of pain in his back and arms and never feeling rested. [R. 925-26]. Dr. Hodge noted that Plaintiff was able to sell his chiropractic practice and would be moving to Florida soon. [R. 926]. The doctor prescribed Plaintiff more hydrocodone because that helped with his pain. *Id.*

On June 19, 2013, Plaintiff presented to Dr. Christopher Snyder for chiropractic treatment. [R. 1238-67]. Dr. Snyder stated that Plaintiff appear relaxed, had normal ambulation, normal gait, and good posture. [R. 1243]. Plaintiff's complaints were in his bilateral cervical region at the neck area, left thoracic region at the upper back area, bilateral thoracic region at the lower back area, and bilateral lumber region at the lumbopelvic area. [R. 1263]. Dr. Snyder laid out a comprehensive treatment plan for Plaintiff to have chiropractic

manipulative therapy. [R. 1265-67]. Plaintiff continued treating with Dr. Snyder until December 2014 for his soreness and stiffness from his pain. [R. 1248-62]. According to Plaintiff, he was having issues doing household chores because of his "disabled left arm." [R. 1283].

On July 26, 2013, Plaintiff presented to Dr. Tagrid Adili for a neurological evaluation of his previous history of bilateral cerebral hemorrhages. [R. 1143-47]. Dr. Adili noted that Plaintiff had his first stroke at age 22 when he was lifting weights and had weakness on his left side, which was attributed to bilateral cerebral hemorrhaghes. [R. 1143]. Dr. Adili stated that "[o]ver the last five to six years, the main problem the patient is having...is one of severe depression," along with general pain in his shoulders, knees, elbows, wrists, neck, and lower back. *Id.* As the doctor noted, Plaintiff developed focal seizure activity in his left arm between the time he had his first and second episodes of left-sided weakness in 1997 and 1998. [R. 1144]. Dr. Adili recommended that Plaintiff take a low dose of Elavil for his residual anxiety, "which is causing insomnia and persistent pain needing narcotics." [R. 1146]. According to the doctor, getting Plaintiff's anxiety and depression under control would help decrease Plaintiff's daytime fatigue. *Id.* When Plaintiff returned for a follow-up to Dr. Adili, Plaintiff reported that, although the amitriptyline reduced Plaintiff's pain and helped him sleep better at night, Plaintiff was still experiencing "severe disabling fatigue." [R. 1141]. Plaintiff also reported that the Elavil helped with his anxiety. *Id.* Dr. Adili concluded that Plaintiff should continue his dose of Elavil for his anxiety and pain, in addition to the BuSpar and Venlafaxine he took for his anxiety, and be evaluated for narcolepsy. [R. 1142]. Dr. Adili did note that Plaintiff stated that the hydrocodone he takes helps with his pain and increases his energy, but he did not want to take too much of it. *Id.* According to Dr. Adili, Plaintiff was

fully compliant with his CPAP at night, as well. [R. 1179]. Although Plaintiff reported feeling fatigued during the daytime still, Plaintiff's wife noted that Plaintiff was less anxious and less irritable during the daytime. [R. 1180]. At his next follow-up, Dr. Adili placed Plaintiff on Strattera for his daytime fatigue. *Id.*

Plaintiff filled out a Disability Report—Adult on August 22, 2013. [R. 212-21]. Plaintiff listed the following physical and mental conditions that limit his ability to work: dystonia related to hemorrhagic stroke, chronic fatigue, back pains, repression/anxiety, depression, and wrist problems. [R. 213]. According to Plaintiff, he stopped working because of his condition. *Id.*

Plaintiff's wife, Meredith Slaymaker, completed a Supplemental Third Party Anxiety Questionnaire on August 28, 2013. [R. 232-34]. Mrs. Slaymaker stated that Plaintiff started having anxiety attacks a few years before, with the most recent 3-4 attacks occurring in the last six months. [R. 233]. She said that stress and pain caused the attacks and that deep relaxation techniques and walking helped to relieve the symptoms of an attack. *Id.* During an attack, Mrs. Slaymaker said that Plaintiff experiences rage and frustration and becomes fidgety and nervous. *Id.*

Also on August 28, 2013, Mrs. Slaymaker completed a Function Report—Adult—Third Party. [R. 224-31]. Mrs. Slaymaker asserted that Plaintiff's condition has made him "unable to function in all facets of his life." [R. 224]. According to his wife, Plaintiff cannot work and cannot contribute fully to household responsibilities. *Id.* Mrs. Slaymaker said that on a daily basis Plaintiff wakes up, eats breakfast, showers, rests after lunch for "nearly 2-3 hours," and then eats dinner and helps their children with homework. [R. 225]. She also stated that she primarily cares for their dogs and children but that Plaintiff helps when he is able. *Id.* Mrs.

Slaymaker alleged that Plaintiff sleeps all the time but wakes up tired because he never has restful sleep. *Id.* However, she stated that Plaintiff has no problem with personal care and does not need reminders to take care of personal needs or to take medications. [R. 225-26]. Further, Mrs. Slaymaker stated that there has been no change in Plaintiff's cooking habits since his conditions began. [R. 226]. According to his wife, Plaintiff helps a few times a week with housework by doing laundry and doing dishes. *Id.* Mrs. Slaymaker stated that Plaintiff is able to drive a car, can go out alone, and occasionally shops for groceries. [R. 227]. However, Plaintiff has been more forgetful with bill payment after his conditions began. [R. 228]. Mrs. Slaymaker said that Plaintiff used to be interested in many more activities than just watching television and playing video games, such as playing golf and doing yard work. *Id.* She noted that his only social activities are over the telephone or on the computer because he does not go out on a regular basis. *Id.* According to Plaintiff's wife, his conditions affect his memory, completing tasks, using his hands, and getting along with others. [R. 229]. She stated that he is often unable to relate to people now, forgets things easily, does not complete certain tasks, and does not handle stress well. [R. 229-30].

Plaintiff filled out a Supplemental Pain Questionnaire on August 31, 2013. [R. 235-37]. Plaintiff stated that he has severe pain in his left arm, upper back, and left hand. [R. 235]. According to Plaintiff, his pain is caused by cold exposure, standing, bending, sitting in an office chair, lifting, and carrying. *Id.* Plaintiff claimed that his pain lasts all day, every day but that his medication (hydrocodone, meloxicam, and amitriptyline) "provides some relief." [R. 236]. Plaintiff said that the medication does not cause him any side effects. *Id.* Besides medication, Plaintiff stated that he has tried a TENS unit, chiropractic massages, and physical therapy for his pain. *Id.* According to Plaintiff, he can only prep basic foods because he can only use one

hand, he cannot help much with house cleaning, he does laundry, he does not do any shopping because it is too painful to walk, he has trouble sleeping, he only drives short distances, he stopped doing social activities that caused him pain, it is difficult to help with childcare because lifting and playing on the floor causes him extreme pain, and he gets sore after a few minutes of sitting or standing. [R. 236-37].

Also on August 31, 2013, Plaintiff filled out a Function Report—Adult. [R. 238-45]. In addition to the limitations Plaintiff listed in the Supplemental Pain Questionnaire discussed above, Plaintiff said his conditions make it increasingly harder to perform his job because he would "adjust a patient and then require rest or a nap." [R. 238]. Plaintiff stated that he would have to take at least a two-hour nap each day. *Id.* According to Plaintiff, he can walk for twenty minutes before needing to stop and rest and can pay attention for ten minutes at a time. [R. 243]. Plaintiff stated that he uses a brace for his left hand. [R. 244].

Plaintiff filled out a Supplemental Fatigue Questionnaire on August 31, 2013. [R. 246-48]. According to Plaintiff, he is tired from the time he wakes up to the time he goes to bed and he naps for 2-3 hours throughout the day. [R. 246]. Plaintiff stated that when he wakes up he never feels rested. *Id.* He also stated that he is not taking any medication for his fatigue. [R. 247].

On August 31, 2013, Plaintiff also completed a Supplemental Anxiety Questionnaire. [R. 249-51]. He stated that he started having anxiety attacks in the previous year and a half. [R. 249]. According to Plaintiff, he experienced fifteen anxiety attacks in the preceding six months. [R. 250]. He stated that the attacks last 20-30 minutes. *Id.* Plaintiff said the attacks are caused by stress, his children, and his pets, and they are made worse by stress at home and his pain. *Id.* However, sleep and medication help relieve the symptoms of his attacks.

*Id.* According to Plaintiff, his attacks make him feel "overwhelmed and helpless with impending doom," make him feel worthless, and he is unsure what to do and how to do it. *Id.* Plaintiff stated that his anxiety attacks make him unable to take care of anything, cause him to worry, and cause him to want to sleep. [R. 251].

On September 24, 2013, Joel Perez, SDM, performed a residual functional capacity assessment of Plaintiff. [R. 83-86]. Mr. Perez determined that Plaintiff's exertional limitations were the following: occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of six hours in an eight-hour workday, sitting for a total of six hours in an eight-hour workday, and unlimited pushing or pulling. [R. 83]. Mr. Perez determined that Plaintiff's postural limitations were occasionally climbing ramps or stairs, never climbing ladders, ropes, or scaffolds, occasionally balancing, occasionally stooping, occasionally kneeling, occasionally crouching, and occasionally crawling. [R. 83-84]. Mr. Perez noted that Plaintiff had no manipulative, communicative, visual, or environmental limitations. [R. 84]. In conclusion, Mr. Perez did not make a finding as to Plaintiff's ability to perform his past relevant work, but he stated that, based on the RFC, Plaintiff would be able to perform light work. [R. 85]. He found Plaintiff to not be disabled. *Id.* On the same date, Dr. Eric Weiner, a State agency consultant, performed a medical/psych consultation of Plaintiff for his disability determination. [R. 79-82].

On October 22, 2013, Plaintiff filled out a Disability Report—Appeal, claiming that his idiopathic hypersomnia had worsened and he was tired all the time, requiring multiple naps per day. [R. 254-59]. Plaintiff also alleged that he has trouble staying awake and focusing. [R. 254]. According to Plaintiff, his personal relationship with his wife and children was suffering due to his anxiety and exhaustion. [R. 257].

On December 4, 2013, Plaintiff's request for reconsideration of his disability claim was denied. [R. 88-102]. Plaintiff claimed that his idiopathic hypersomnia had worsened, he was always tired, he had to take multiple naps in a day in order to function, and that this was affecting his cognitive abilities. [R. 89]. Dr. Steven Wise, Psy. D., found that, in addition to Plaintiff's previous diagnoses, Plaintiff also had severe CVA, late effects of cerebrovascular disease, severe chronic fatigue syndrome, and non-severe anxiety disorders. [R. 95].

Then, Dr. David Guttman performed a residual functional capacity assessment. [R. 98]. Dr. Guttman determined that Plaintiff's exertional limitations were the following: occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of six hours in an eight-hour workday, sitting for a total of six hours in an eight-hour workday, and unlimited pushing or pulling. [R. 98]. Dr. Guttman determined that Plaintiff's postural limitations were occasionally climbing ramps or stairs, never climbing ladders, ropes, or scaffolds, occasionally balancing, occasionally stooping, occasionally kneeling, occasionally crouching, and occasionally crawling. [R. 99]. Dr. Guttman noted that Plaintiff had no manipulative, communicative, or visual limitations. *Id.* However, Plaintiff had environmental limitations of avoiding concentrated exposure to hazards. [R. 99-100]. Dr. Guttman noted that Plaintiff's gait was "mildly unsteady but [he was] able to walk on heels and toes without difficulty."[3] [R. 100]. Dr. Guttman therefore found that, considering the totality of the evidence, Plaintiff should be able to function within the restrictions of his RFC and was not disabled. [R. 100-02].

Plaintiff again presented to Dr. Adili in May of 2014 for management of his daytime fatigue due to sleep apnea and idiopathic hypersomnia. [R. 1281]. Dr. Adili noted that

---

[3] Plaintiff has apparently had a limp in his left leg since 1976, when he was almost two years old. [R. 347].

Plaintiff was prescribed Adderall and Cymbalta. *Id.* Plaintiff recently had carpal tunnel release surgery in his right hand for his right-sided, moderately severe carpal tunnel syndrome, and Plaintiff reported significant improvement in his right hand since the surgery. *Id.* In a follow-up visit, Plaintiff reported that an increase in his Cymbalta dose was treating him well. [R. 1279]. According to Plaintiff, "he just has to prioritize his time and attention and provided he doesn't try to focus on 3 things at the same time he is able to concentrate and get the job done." *Id.* Dr. Adili noted that Plaintiff takes care of his 2 children while his wife works during the day, but he cannot read and take care of his kids at the same time because "his kids require a lot of attention." *Id.* In July of 2014, Dr. Adili prescribed Plaintiff dextroamphetamine to take in addition to his Adderall. [R. 1277]. Dr. Adili noted in December of 2014 that Plaintiff was better on the Cymbalta than on the BuSpar and Effexor as far as both his mood and his pain. [R. 1270]. However, Plaintiff reported feeling slightly anxious and wanting to start back on Cymbalta in combination with the BuSpar. *Id.*

On June 20, 2014, Dr. Snyder performed an X-ray of Plaintiff's spine, which indicated Plaintiff had mild degenerative disc disease at L3/L4, L4/L5, and L5/LS; moderate degenerative disc disease at T9/T10, T10/T11, and T11/T12; spur formation at T10-T12; mild degenerative disc disease at C4/C5, C3/C4, and C5/C6; and spur formation at C5-C7. [R. 1310-12].

On November 20, 2014, Dr. Peterson wrote a letter discussing Plaintiff's issues with obstructive sleep apnea, idiopathic hypersomnolence, late effects of stroke with spastic left hemiparesis, focal dystonia, severe anxiety, and moderate depression with somatic focus. [R. 1320]. Plaintiff had last seen Dr. Peterson in July of 2014. *Id.* According to Dr. Peterson, Plaintiff's "significant movement disorder of his left arm and hand" was a result of his prior stroke. *Id.* Dr. Peterson noted that this disorder "makes it impossible for [Plaintiff] to work in

19

his profession." *Id.* Dr. Peterson also noted that Plaintiff's sleep apnea was well-treated but he was still having markedly abnormal sleep studies, confirming "profound hypersomnolence." *Id.* According to Dr. Peterson, "[i]diopathic hypersomnolence is difficult to treat and tends to respond poorly to medications. Hypersomnolence makes long term employment difficult as patients tend to fall asleep at work and get tired and have difficulty with sustained concentration." *Id.* Thus, Dr. Peterson concluded that Plaintiff was "disabled from his profession." *Id.*

### C. ALJ Decision

The ALJ issued her decision on Plaintiff's claim for benefits on March 31, 2015. [R. 27-45]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 30-32]. She found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018, and had not engaged in substantial gainful activity since June 1, 2013, the alleged on-set date. [R. 32]. The ALJ then found that Plaintiff suffers from the following severe impairments: lumbosacral spondylosis, obesity, status post bilateral cerebral hemorrhage, tenosynovitis of bilateral hands and wrists, late effects of cerebrovascular disease, obstructive sleep apnea, idiopathic hypersomnia, chronic fatigue syndrome, depressive disorder, and anxiety disorder. *Id.* The ALJ also found that Plaintiff had the following non-severe or not medically determinable impairments: organic mental disorder and mild dystonia. *Id.*

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 33]. The ALJ noted that "the record does not establish that [Plaintiff's physical impairments] meet or medically equal the requirements of any

20

section of the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4, including Section 1.04." *Id.*

Further, the ALJ found that Plaintiff's mental impairments "considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 or 12.06." *Id.* The ALJ then evaluated the four functional areas of the "paragraph B" criteria of the listings. *Id.* The ALJ concluded that "[b]ecause [Plaintiff's] mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." [R. 34]. The ALJ then found that the evidence failed to establish the presence of any of the "paragraph C" criteria of the listings. *Id.*

Next, the ALJ completed a residual functional capacity ("RFC") assessment and found that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b). *Id.* Specifically, the ALJ stated that Plaintiff could "occasionally balance, stoop, kneel, crouch, crawl and climb ramps or stairs," but was unable to climb ladders, ropes, or scaffolds. *Id.* Further, the ALJ stated that Plaintiff "requires the option to sit every 45 minutes for up to two minutes, but he can continue work while seated," and "can perform frequent handling with the bilateral hands." [R 34-35]. However, the ALJ found that Plaintiff must avoid concentrated exposure to hazards. [R 35]. Finally, the ALJ stated that Plaintiff "can perform simple and routine tasks, as well as a few detailed tasks." *Id.* The ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.*

The ALJ then followed the two-step process—first, determining whether there is an

underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. *Id.* The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in this decision." *Id.* The ALJ then went through the various medical records in detail. [R. 35-37].

In terms of the opinion evidence, the ALJ explained that she gave substantial weight to the opinion of the State agency physical medicine consultant, but also found that Plaintiff had "additional limitations in bilateral handling." [R. 37]. Moreover, as far as Plaintiff's State agency mental health consultants, the ALJ found that their opinions were supported by substantial evidence, but "in giving [Plaintiff's] allegations some benefit of the doubt, [the ALJ found] that [Plaintiff] is more limited than suggested by the consultants in terms of cognitive function." [R. 38]. Further, the ALJ assigned "very little weight" to the opinion of Dr. Andrew Peterson, M.D., Plaintiff's physician. *Id.*

The ALJ next concluded that, considering Plaintiff's RFC, Plaintiff was unable to perform his past relevant work because it exceeds his RFC. *Id.* The ALJ noted that this conclusion was supported by the hearing testimony of the vocational expert. *Id.* The ALJ, however, did note that there were light work jobs that exist in significant numbers in the national economy that Plaintiff could perform, including storage facility rental clerk, furniture rental clerk, or parking lot attendant. [R. 39].

Finally, the ALJ found that Plaintiff "has not been under a disability, as defined in the

Social Security Act, from June 1, 2013, through the date of this decision." [R. 40].

D. Additional Evidence Submitted to Appeals Council and Appeal's Council Decision

Subsequent to the hearing in front of the ALJ, Plaintiff sent the Appeals Council new updated medical records on August 11, 2015 that were not presented on the date of his last hearing in front of the ALJ. [R. 6, 1322-1449]. The records were from Dr. Tagrid Adili dated January 5, 2015 through March 11, 2015; John Goggin D.P.M. dated February 4, 2015 through April 15, 2015; Dr. Joseph Wierzbiki dated March 26, 2014 through June 4, 2015; Dr. Anthony Afong dated April 7, 2015 through August 3, 2015; and Oasis Chriopractic and Wellness, Inc. dated April 6, 2015 through July 21, 2015. *Id.*

From March 26, 2014 through June 4, 2015 Plaintiff presented to Dr. Joseph Wierzbicki and Dr. Robert Forester at Florida Orthopaedic Specialists for his wrist and right hand pain. [R. 1342-76]. The doctors diagnosed Plaintiff with moderately severe carpal tunnel syndrome, and Plaintiff received a right carpal tunnel release. [R. 1364, 1368, 1376]. Plaintiff was also diagnosed with right wrist tendonitis, De Quervain's tenosynovitis, and arthritis. [R. 1350, 1356]. Plaintiff received steroid injections for his hand and wrist pain. [R. 1347, 1352-53 1376].

Plaintiff saw Dr. Adili again from January 5, 2015 through March 11, 2015 for his chronic back pain, obstructive sleep apnea, idiopathic hypersomnia, and depressive disorder. [R. 1322]. Dr. Adili stated that Plaintiff was only seeing him mainly for "follow-up to give him refills on the pain meds and the stimulants." [R. 1323]. Plaintiff was taking Cymbalta for his back pain, which also helped with his anxiety and depression, in addition to the BuSpar. *Id.* Moreover, the Adderall and Dextroamphetamine were helping with Plaintiff's fatigue. *Id.* However, in April of 2015, after Dr. Afong did not want to take over prescribing Adderall to

Plaintiff, Dr. Adili discharged Plaintiff from his practice.   [R. 1329].

From February 4, 2015 through April 15, 2015, Plaintiff also saw Dr. John Goggin for his heel pain caused by plantar fasciitis and hallux rigidus.   [R. 1331-40].

Plaintiff presented to Dr. Anthony Afong from April 7, 2015 through August 3, 2015 for testicular hypofunction, drug dependence, cervical and lumbar spondylosis, neck, thoracic, and low back pain, and hypersomnia with sleep apnea.   [R. 1378].   Plaintiff had an MRI of his thoracic spine performed in April of 2015, which showed mild degenerative disc disease "throughout the lower thoracic spine greatest at T11-T12."   [R. 1432].   Plaintiff also had an MRI of his cervical spine done, which showed mild degenerative disc disease at C4-5 and C5-6 and multilevel degenerative spondylosis with mild to moderate bilateral degenerative foraminal narrowing.   [R. 1430-31].   Finally, Plaintiff had an MRI of his lumbar spine showing degenerative disc disease and multilevel degenerative spondylosis; "a small distal left foraminal protrusion with associated annular tear causing mild to moderate distal foraminal narrowing on the left with probably mild abutment of the exiting nerve root" at L3-4; and "a small distal left foraminal protrusion...without evidence of abutment or impingement."   [R. 1428-29].   Dr. Afong administered lumbar facet injections and cervical joint injections to Plaintiff.   [R. 1380, 1382, 1388].   In addition to seeing Dr. Afong, Plaintiff continued getting chiropractic treatment with Dr. Snyder through July of 2015.   [R. 1437-49].

On November 20, 2015, the Appeals Council denied Plaintiff's request for review because it found no reason under the rules to review the ALJ's decision dated April 1, 2015. [R. 1].

## II.   MOTIONS FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment with Supporting Memorandum of Law, Plaintiff

makes two main arguments. [DE 37]. First, he argues that the ALJ erred by failing to weigh the opinions of his examining physicians (Dr. Loth and Dr. Brooks), failing to provide sufficient rationale for rejecting the opinion of a consultative examining physician (Dr. Peterson), and adopting the opinion of a non-examining source. [DE 37, pp. 13-18]. Next, Plaintiff asserts that the ALJ erred in "rendering an unfavorable credibility finding not supported by substantial evidence of record." [DE 37, pp. 18-19]. Therefore, Plaintiff asks that this Court reverse the denial of Plaintiff's application for disability benefits and remand this matter for further administrative proceedings. [DE 37, p. 19].

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment, she argues that substantial evidence supports the weight that the ALJ gave to the medical opinions of record. [DE 38, pp. 4-9]. Defendant next claims that the ALJ's finding that Plaintiff's allegations were not entirely credible was supported by substantial evidence. [DE 38, pp. 9-13]. Therefore, Defendant asks the Court to affirm the Commissioner's decision. [DE 38, p. 14].

Plaintiff filed a Reply [DE 40] to Defendant's Motion for Summary Judgment maintaining all of his arguments. Plaintiff claims that the ALJ erroneously accorded substantial weight to the opinion of the State agency physical medicine consultant while giving very little weight to Plaintiff's treating physician, Dr. Peterson, and failing to discuss the opinions of Dr. Loth and Dr. Brooks. [DE 40, p. 1]. Plaintiff also asserts that the ALJ did not provide substantial evidence in support of her negative credibility finding of Plaintiff. [DE 40, p. 6].

### III.  LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards.   Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  42 U.S.C.  § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)).   Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]."  *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact.   No presumption of validity attaches to the Commissioner's conclusions of law.   *Brown v. Sullivan*, 921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir. 1990).   "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal."  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability.   20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f).   The ALJ must first determine whether the claimant is presently employed.   If so, a finding of non-disability is made, and the inquiry concludes.   20 C.F.R. § 404.1520(b).   In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments.   If the ALJ finds that claimant does not suffer from a severe impairment or

combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

The Eleventh Circuit has established a three part "pain standard" to be utilized by the ALJ when a claimant tries to "establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991). The standard requires "(1) evidence of an underlying medical condition and either (2) objective

27

medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* Moreover, "[t]he claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Id.* The ALJ must specifically explain why he or she is deciding to discredit such testimony, and "[f]ailure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Id.*

A.  <u>Whether the ALJ erred in failing to address the opinions of Dr. Loth and Dr. Brooks</u>

Plaintiff claims that the ALJ completely failed to address the opinions of Plaintiff's examining physicians, Dr. Loth and Dr. Brooks, resulting in harmful error. [DE 37, p. 13]. According to Plaintiff, Dr. Brooks' opinion on Plaintiff's hypersomnolence should have been addressed because it was consistent with the opinions of Dr. Adili and Dr. Peterson. [DE 37, p. 14]. Moreover, Plaintiff asserts that the ALJ should have addressed Dr. Loth's opinion regarding Plaintiff's manipulative limitations, specifically in Plaintiff's left upper extremity. *Id.* Plaintiff also asserts that Plaintiff's limitation in his left upper extremity should have been presented in a hypothetical to the vocational expert during the hearing before the ALJ. [DE 37, p. 15]. Plaintiff further argues that remand would not be a wasteful corrective exercise. [DE 40, p. 2].

According to Defendant, the ALJ had good reason to not adopt the opinions of Dr. Loth and Dr. Brooks. [DE 38, p. 7]. Defendant claims that Dr. Loth's and Dr. Brooks' opinions that Plaintiff was disabled were not supported by the evidence because Plaintiff kept working for months after he saw the physicians and because he took care of his kids while his wife worked. *Id.* Further, Defendant argues that Dr. Loth's opinion that Plaintiff could not perform work as a

chiropractor because of his left hand impairment was inaccurate because "subsequent neurological tests do not indicate that Plaintiff had substantial weakness or pain in the left arm or other neurological impairments in the left arm after his carpal tunnel release surgery." [DE 38, p. 8].

Plaintiff is correct that the ALJ did not address the opinions of Plaintiff's examining physicians, Dr. Loth and Dr. Brooks. "An ALJ must consider all medical opinions in a claimant's case record, together with other relevant evidence." *McClurkin v. Soc. Sec. Admin.*, 625 Fed.Appx. 960, 962 (11th Cir. 2015)(citing 20 C.F.R. § 404.1527(b)). The ALJ must state with particularity what weight, if any, is given to the different medical opinions and the ALJ's reasons therefor. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Even if it is possible that the ALJ considered and rejected medical opinions, 'without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence.'" *Himes v. Comm'r of Soc. Sec.*, 585 Fed. Appx. 758, 765 (11th Cir. 2014) (quoting *Winschel*, 631 F.3d at 1179).

Here, the ALJ completely failed to address the opinions of Plaintiff's examining physicians, Dr. Loth and Dr. Brooks. Moreover, the ALJ did not cite to any of the records of Dr. Loth or Dr. Brooks in her discussion of Plaintiff's medical history. Therefore, it is not clear to the undersigned to what extent, if at all, the ALJ analyzed the opinions of Dr. Loth and Dr. Brooks. The opinions of Dr. Loth [R. 746, 756-59] and Dr. Brooks [R. 714-20] could have possibly changed the outcome of the ALJ's decision. However, the decision issued by the ALJ never once mentions the name of Dr. Loth or Dr. Brooks. Because Dr. Loth and Dr. Brooks were Plaintiff's examining physicians, the ALJ's failure to address their opinions was reversible error. As a result, the Court is "unable to determine whether the ALJ's conclusions about the

29

medical opinions are supported by substantial evidence." *Id.* at 766.  Thus, the case must be remanded on that basis.  *See Berrios v. Colvin*, CASE NO. 14-23860-CIV-SIMONTON, 2016 WL 5661634, *12 (S.D. Fla. Sept. 30, 2016).

B.  Whether the ALJ erred in giving the opinion of<br>Plaintiff's treating physician, Dr. Peterson, very little weight

Plaintiff contends that the ALJ erred in assigning very little weight to the opinion of Plaintiff's treating physician, Dr. Peterson.  [DE 37, p. 15].  Defendant claims that the ALJ's decision to give Dr. Peterson's opinion little weight was supported by substantial evidence. [DE 38, p. 5].

In this case, it is unclear what weight the ALJ gave to Plaintiff's examining physicians, Dr. Loth and Dr. Brooks, if any.  That error dictates remand of the case as stated above in Section III, A.  Therefore, on remand, the ALJ should also re-evaluate Dr. Peterson's opinion after conducting a proper analysis and assessment of the opinions and treatment records of Dr. Loth and Dr. Brooks.  *See Berrios*, 2016 WL 5661634 at *14.

C.  Whether the ALJ Erred in her credibility finding of Plaintiff

Plaintiff contends that the ALJ failed to "properly consider the evidence of record of Plaintiff's severe hypersomnolence, the *Holt* factors, and SSR 96-7p in finding Plaintiff not credible and not disabled."  [DE 37, p. 18].  Defendant asserts that the ALJ's finding that Plaintiff's allegations were not credible was supported by substantial evidence because Plaintiff "failed to provide objective medical or other evidence to support his subjective complaints of disabling pain."  [DE 38, p. 10].

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising

from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt,* 921 F. 2d at 1223. The ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 35]. She then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. *Id.* The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in this decision." *Id.*

However, an ALJ's determination of credibility "may be affected by the lack of a fully developed record, and should be revisited on remand." *Berrios,* 2016 WL 5661634 at *15. Although the ALJ followed the proper procedure regarding her credibility determination of Plaintiff, the ALJ's consideration of the additional medical opinion evidence on remand, as discussed above, will require the ALJ "to re-evaluate the credibility of the Plaintiff based upon the entirety of the record." *Id.* Therefore, the Court finds that the case should be remanded for the ALJ to make a new credibility determination of Plaintiff based upon a review of the entire record. *Id.*

## IV.   CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision is

**VACATED AND REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C § 405(g), with instructions for the ALJ to hold a further hearing, to fully consider and discuss the opinions of Plaintiff's examining physicians, Dr. Loth and Dr. Brooks, to re-evaluate the opinion of Plaintiff's treating physician, Dr. Peterson, and to re-evaluate Plaintiff's credibility in accordance with this Order. The Court expresses no opinion as to what the ultimate decision of the Commissioner should be on remand. Accordingly, Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law [DE 37] is hereby **GRANTED**, and Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment [DE 38] is hereby **DENIED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this _10th_ day of August, 2017.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE